```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
RON FELDMAN,                     :
                                 :
            Plaintiff,           :      MEMORANDUM AND ORDER
                                 :
      - against -                :      06 Civ. 2490 (MHD)
                                 :
UNITED PARCEL SERVICE, INC.,     :
GARY WEISS, INC. and GARY WEISS, :
                                 :
            Defendants.          :
--------------------------------x
```

**MICHAEL H. DOLINGER, U.S.M.J.:**


Defendant United Parcel Service ("UPS") has moved for summary judgment against plaintiff Ron Feldman, contending that UPS is not liable for the loss of a diamond ring that plaintiff shipped via UPS. We grant summary judgment in favor of UPS on all but one of plaintiff's state-law tort claims. We deny summary judgment on plaintiff's breach-of-contract claims and on what amounts to a federal common-law negligence claim and a fraudulent-inducement claim.


I. <u>The Evidentiary Record</u>


Since UPS is moving for summary judgment, we summarize the pertinent events as reflected in the evidentiary record. Most of these facts are not in dispute, but we indicate those matters not

1

conclusively established on the current motion.

In February 2005, while searching on the internet, Mr. Feldman and his wife, both of whom are Florida domiciliaries, decided to purchase a diamond ring through the Jewelry 47 website. (Dep. of Ron Feldman 19:9-23:8, July 18, 2006.) Jewelry 47 is a retail store and website operated by defendant Gary Weiss, Inc. (Dep. of Gary Weiss, 23:3-25:12, Oct. 11, 2006; Def.'s R. 56 Statement ¶ 3.) The store is located at 570 5th Avenue, New York, New York. (Def.'s R. 56 Statement ¶ 3; Compl. ¶¶ 8-17.)

On February 10, 2005, Feldman entered into a purchase agreement with Gary Weiss, Inc., to purchase a 7.24 carat round brilliant cut diamond ring for $57,000.00. (Feldman Dep. 40:12-19; Weiss Dep. 49:17-51:22; Def.'s R. 56 Statement ¶¶ 7-9; Decl. of Capricci G. Bilandal in Supp. of UPS's Mot. for Summ. J. Ex. E (Purchase Agreement); Compl. ¶ 18.) Under the agreement, Feldman reserved the right to return the diamond ring to Gary Weiss, Inc. within seven days of receipt of the ring for a full refund if he was dissatisfied with its quality. (Def.'s R. 56 Statement ¶ 8; Compl. ¶ 20; see also Bilandal Decl. Ex. E.) Feldman completed payment of the $57,000 to Gary Weiss by wire transfer on February 14, 2005. (Feldman Dep. 47:25-48:4; Def.'s R. 56 Statement ¶ 9; Compl. ¶ 25.) On February 21, 2005, Feldman received the diamond

2

ring. (Feldman Dep. 53:22-54:9; Def.'s R. 56 Statement ¶ 10; Compl. ¶¶ 31-32.) The next day, he notified Gary Weiss, Inc. via e-mail that he was unhappy with the ring and would ship it back via UPS to receive a full refund. (Feldman Dep. 60:14-62:22; Def.'s R. 56 Statement ¶ 10; Compl. ¶¶ 32-34.)

On February 22, 2005, Feldman went to a local UPS shipping service center, located at 3800 N.W. 16th Street, Ft. Lauderdale, Florida. (Feldman Dep. 62:25-63:5; Def.'s R. 56 Statement ¶ 11; Compl. ¶ 37.) According to Feldman, while inside the UPS store he placed the diamond ring in a shipping box addressed to Gary Weiss, Inc., and a UPS Customer Counter Associate directed him to complete the shipping label for his package on the I-Ship Online Shipping computer system ("I-Ship System") located in the store. (Feldman Dep. 71:3-6; Def.'s R. 56 Statement ¶ 12.)

Mr. Feldman used the I-Ship System at a separate computer terminal at the UPS counter. (Aff. of Evangeline Melvin ¶ 8, Dec. 22, 2006; Feldman Dep. 71:13-17.) On this terminal, after the customer logs into the system, the screen prompts the user to type in the sender's address and various other contact information, the recipient's address and other contact information, and "[a]dditional [s]hipping [i]nformation." (Melvin Aff. ¶¶ 11-13 & Ex. 2.) The "additional [] information" fields ask for a

description of the package, the sender's deadline for delivery and the package value. (<u>Id.</u> ¶ 15 & Ex. 2.) The package value field is situated below a bolded statement that reads, "I want to purchase protection above $100." (<u>Id.</u>) This prompt allows shippers to purchase insurance in excess of $100.00 for their shipment. (<u>Id.</u>) UPS states -- and plaintiff does not contest -- that the I-Ship System will not print a label for which the value entered exceeds $50,000. (<u>Id.</u> ¶ 5; Dep. of Evangeline Melvin 24:21-24:22, Oct. 19, 2006.)

Just above the "Print" button, which a customer must click to print the shipping label, the screen reads as follows: "Review everything carefully and then click **Print** to print your shipping request." (Melvin Aff. ¶ 15 & Ex. 3.) Below the "Print" button are two hyperlinks, one entitled "Terms of Service" and the other entitled "Privacy Policy." (<u>Id.</u> ¶ 16 & Ex. 3.) If a customer clicks on the "Terms of Service" button, a pop-up window is displayed on the computer screen that states that all shipments are subject to restrictions set forth in the UPS Tariff. (<u>Id.</u> ¶ 17 & Exs. 3-4.) The pop-up screen further states that the UPS Tariff is available on the UPS website or upon request from the counter associate, and it provides the web address of the general UPS website. (<u>Id.</u>) The pop-up screen, however, does not provide a hyperlink to the UPS website or the terms of the tariff. (<u>Id.</u> ¶ 17 & Ex. 4.)

4

Item 460 on page eight of the UPS Tariff Agreement is known as the "Articles of Unusual Value" provision. It states that "[s]hippers are prohibited from shipping articles of unusual value via UPS. Articles of unusual value shall be deemed to include . . . [a]ny package having an actual value of more than $50,000." (Aff. of Richard Stubits Ex. D at 8, Dec. 21, 2006.) The Tariff does not define the term "actual value," but, as noted, Feldman paid $57,000 for the Diamond Ring. (Bilandal Decl. Ex. E.) Also, the "Gem Institute Laboratory" appraised the ring at $135,000. (Id. Ex. F.)

After filling out the relevant information on the I-Ship computer program,[1] Feldman printed out the shipping label and gave it to the counter associate, who affixed it to the package. (Feldman Dep. 87:7-23.) According to plaintiff, the associate asked him if he wished to purchase insurance for the package. (Id. at 87:25-88:5.) Feldman testified that he told the associate that he wanted to purchase insurance worth $57,000, that the item he was shipping was jewelry and that he wanted the package to go by Next Day Air Service. (Id. at 88:5-7, 90:5-11.) Feldman says that the associate then informed him that $50,000 was the maximum amount of

---

[1] Mr. Feldman stated in his deposition that he recalled typing in the address to which the box was going and the address from which it was being sent. (Feldman Dep. 85:12-24.) He did not recall whether he had typed anything else into the form on the computer. (Id. at 85:25-86:7.)

insurance that "it will take" -- presumably meaning that this was the maximum amount that the computer would allow her to enter. (Id. at 90:14-20.) By all accounts, Feldman purchased insurance in the amount of $50,000. (Stubits Aff. ¶ 6; Feldman Dep. 90:14-20.) He paid a total of $235.50 to UPS for the shipping and insurance charges and left the shipping center. (Compl. ¶¶ 41-42.)

The attendant placed the package in what is known as the "high value cage," where it remained until shipment. (Melvin Dep. 49:12-22.) The package quickly moved through the UPS system as a "high value" Next Day Air package and arrived in the New York UPS hub for delivery at 7:28 a.m. on February 23, 2005. (Bilandal Decl. Ex. I.)

At 7:41 a.m., a UPS driver, Albert Ambrose, personally received the package, signed off on it, and was accompanied by a security detail on his delivery route. (Dep. of Albert Ambrose 12:20-22, 22:19-20, 23:21-24:3, Oct. 27, 2006.) At 2:32 p.m., Ambrose delivered the package to Gary Weiss, Inc. (Ambrose Dep. 34:3-7; Def.'s R. 56 Statement ¶ 18; Bilandal Decl. Ex. I.) When Mr. Weiss was about to open the package, he noticed that it "[didn't] seem right," that is, it appeared that someone had previously tried to open it. (Weiss Dep. 95:8-101:5.) As a result, Mr. Weiss told his secretary, Ms. Milena Cabral, to take the

package and find Mr. Ambrose, who had already left Mr. Weiss's
office, and to open the package in Ambrose's presence. (Weiss Dep.
100:19-101:4.) At about 3:00 p.m., Ms. Cabral approached Ambrose in
the street where his UPS truck was parked and asked to open the
package in front of him. (Ambrose Dep. 34:22-35:3; Dep. of Milena
Cabral 94:12-97:11, Oct. 6, 2006.) Cabral proceeded to open the
package, and both of them observed that the diamond ring was
missing from the jewelry box. (Def.'s R. 56 Statement ¶ 19.)


II. <u>Procedural Posture</u>


   A. <u>Complaint and Removal</u>


    Plaintiff filed suit in the New York State Supreme Court on
February 21, 2006 against both UPS and Gary Weiss and his company.
He seeks to recover compensatory damages in the amount of
$57,235.59, plus punitive damages. (Notice of Removal ¶¶ 1, 3, Mar.
29, 2006.) He asserts six state-law claims against UPS: (1) fraud;
(2) intentional and negligent misrepresentation; (3) negligence;
(4) breach of contract and/or breach of the duty of good faith; (5)
engaging in deceptive business practices; and (6) tortious
interference with business. (Compl. ¶¶ 50-116.)


    The plaintiff represents that the basis for the fraud claim

against UPS is that it entered into the shipping agreement fraudulently, presumably by agreeing to ship plaintiff's package and allowing him to purchase insurance on it while later taking the position that, under UPS policies as embodied in its tariff, it was never permitted to ship the ring and would refuse to pay the amount for which plaintiff insured the package. In substance, this amounts to a claim for fraud in the inducement, both as to the shipment itself and as to the agreement on insurance. The plaintiff further argues that the negligent- and intentional-misrepresentation claims are based on the contention that UPS knew or should have known that the shipping agreement was false and misleading. We infer that plaintiff bases these claims on the same allegations as those on which he relies for his fraud claim.

Plaintiff also asserts his negligence claim in very general terms, but we infer that it is based on the breach by UPS of its duty to safely deliver or care for plaintiff's property. The breach-of-contract/-duty claim is based on both a contractual covenant/duty to act in good faith and deal fairly, as well as on what appears to be an undertaking by UPS to safely deliver the diamond ring and perhaps to compensate plaintiff in the event of its loss. The deceptive-business-practices claim and the tortious-interference claim, like the negligence claim, are also phrased quite broadly, but presumably they reflect plaintiff's contention

8

that UPS somehow misrepresented its agreement with him.

UPS removed this action to this Court on March 29, 2006, pursuant to 28 U.S.C. § 1441. The basis for the removal was that plaintiff's claims, by virtue of federal statutory preemption, arise under federal common law, thus affording the federal court original jurisdiction over this action pursuant to 28 U.S.C. § 1331. (Notice of Removal ¶ 4.)

B. <u>Defendant's Motion</u>

UPS now moves for summary judgment. (Def. UPS's Mem. of Law in Supp. of its Mot. for Summ. J. 1.)  It argues that summary judgment should be granted because: (1) federal common law preempts plaintiff's state-law claims, thus rendering the terms of the UPS Tariff the sole and exclusive determinant of the parties' rights and responsibilities; and (2) the plaintiff received both constructive and reasonable notice of the UPS Tariff's exclusion-of-liability provision for items of unusual value. (<u>Id.</u> at 7-9, 9-13.)

For the reasons that follow, we grant the motion in part and deny it in part. Specifically, summary judgment is granted as to plaintiff's state-law claims except for breach of an insurance

contract and fraudulent inducement to enter into that contract. Summary judgment is denied with respect to plaintiff's federal common-law negligence and contract claims and his fraudulent-inducement and contract claims -- whether characterized as arising under federal or state law -- with respect to the possible insurance contract.

<u>Analysis</u>

I. <u>Summary Judgment Standard</u>

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see</u>, <u>e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Shade v. Hous. Auth. of the City of New Haven</u>, 251 F.3d 307, 314 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a

summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 322; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co.,

11

398 U.S. 144, 161 (1970); <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. <u>See</u>, <u>e.g.</u>, <u>Beard v. Banks</u>, 126 S. Ct. 2572, 2578 (2006); <u>Celotex</u>, 477 U.S. at 322; <u>Santos v. Murdock</u>, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot rest on "mere allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e); <u>see</u>, <u>e.g.</u>, <u>Amaker v. Foley</u>, 274 F.3d 677, 680 (2d Cir. 2001), nor can he rely on his pleadings or on merely conclusory factual allegations. <u>See</u>, <u>e.g.</u>, <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see</u> <u>also</u> <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. <u>See</u>, <u>e.g.</u>, <u>Celotex</u>, 477 U.S. at 324; <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998); <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 525-26 (2d Cir. 1994).

II. <u>Assessment of the Motion</u>

    A. <u>Defendant's Grounds for Summary Judgment</u>

    Defendant UPS argues that plaintiff's state-law tort claims are preempted by federal common law. (Def.'s Mem. of Law in Supp. 7-9 (citing <u>N. Am. Phillips Corp. v. Emery Air Freight Corp.</u>, 579 F.2d 229 (2d Cir. 1978)).) Under federal common law, UPS asserts, its "contractual liability to Plaintiff . . . is defined by the UPS Tariff, the UPS Rate and Service Guide, and the UPS shipping record, and shippers, like Plaintiff, are bound to the carrier's tariff." (Def.'s Mem. of Law in Supp. 9.)

    If the state-law claims are preempted and the terms of the Tariff therefore govern liability, UPS insists that the express prohibition on the shipment of articles of unusual value (defined in Item 460 of the Tariff as items with an "actual value" of more than $50,000) means that plaintiff bore the risk of loss of the item. (<u>Id.</u> at 9-11.) It argues that it is not liable notwithstanding any fault by UPS and despite Feldman's purchase of insurance in the amount of $50,000, because he elected to ship his package in the face of the prohibition. (<u>Id.</u>) In support of this

argument, UPS asserts that plaintiff is charged with constructive notice of the provisions of the Tariff or, in the alternative, that plaintiff received reasonable notice of the terms under the <u>Sam Majors</u> test.[2] (<u>Id.</u> at 11-16.) UPS also asserts that plaintiff assented to those terms by clicking "Print," situated above the hyperlinked "Terms of Service" icon on the UPS I-Ship system. (Def. UPS's Reply Mem. of Law in Further Supp. of its Mot. for Summ. J. 9-10.)

Finally, UPS argues that oral modification by employees is

_____

[2] The <u>Sam Majors</u> two-prong test is a widely-employed method of determining whether a party had reasonable notice of the terms in a shipping document. <u>See</u> <u>Sam L. Majors Jewelers v. ABX, Inc.</u>, 117 F.3d 922, 930 (5th Cir. 1997); <u>see also</u> <u>Stein Jewelry Co. v. United Parcel Serv., Inc.</u>, 228 F. Supp. 2d 304, 307 (S.D.N.Y. 2002) (utilizing the <u>Sam Majors</u> test as part of its analysis). The test is typically articulated as follows:

> First, the physical characteristics of the airbill are to be examined to determine whether they provide reasonable notice to the customer. . . . The second factor to consider is the conditions under which the shipment was made. The conditions to be considered include the customer[']s "familiarity with the ticket, the time and incentive under the circumstances to study the provisions of the ticket, and any other notice that the passenger received outside of the ticket."

<u>Sam Majors</u>, 117 F.3d at 930 (quoting <u>Deiro v. Am. Airlines, Inc.</u>, 816 F.2d 1360, 1364 (9th Cir. 1987)); <u>see also</u> pp. 30-45, <u>infra</u>, for this Court's analysis of the <u>Sam Majors</u> test as applied to the present case. Note that this test has also been adopted, with slightly different language, in the Second Circuit. <u>See</u> p. 33, <u>infra</u>.

prohibited under the Tariff, and that federal law permits carriers to prohibit modification in this manner. (Def.'s Reply Mem. in Further Supp. 7-8.) Thus, it claims that any interaction that plaintiff had with a UPS employee did not change the terms of the agreement as embodied in the Tariff.[3]

---

[3] Plaintiff does not contest federal jurisdiction, and with good reason. Although plaintiff articulates his claims solely in state-law terms, the parties do not dispute that some federal law applies. Moreover, "under the doctrine of 'artful pleading,' it is not dispositive that plaintiffs have not specifically pled a [federal] claim in their complaint[] where, as here, the gravamen of plaintiffs' claim(s) is lost or damaged goods." Stein Jewelry Co., 228 F. Supp. 2d at 306-07 (quoting In re NASDAQ Mkt. Makers Antitrust Litig., 929 F. Supp. 174, 178 (S.D.N.Y. 1996) for the proposition that "the artful pleading doctrine provides that courts will not permit a plaintiff to use artful pleading to close off a defendant's right to a federal forum . . . and the removal court will seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization") (internal quotation marks omitted). But see Litchfield v. United Parcel Serv., Inc., 136 F. Supp. 2d 756, 762 (S.D. Ohio 2000) (arguing that "because the Plaintiff's complaint does not allege a federal claim on its face," and because the court found that federal deregulation did not amount to complete preemption, federal jurisdiction was lacking).

Because of the significant federal interest in the uniform application of laws governing common carrier liability, see Read-Rite Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190, 1195-97 (9th Cir. 1999), the Second Circuit, concurring with the majority of the circuits, has held that "federal common law continues to control the issue of liability of air carriers for lost or damaged shipments," preempting state-law claims. Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53, 59 (2d Cir. 2000). The Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713 (1978), and the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. § 1501 (amended 1997), do not supplant the use of federal common law to govern such actions; in fact, they expressly preserve it. Sam Majors, 117 F.3d at 927-29; see also Nippon Fire, 235 F.3d at 59. Moreover, a claim arising under federal common law satisfies federal-question jurisdiction pursuant to 28 U.S.C. § 1331. See Illinois v. City

B. Plaintiff's Grounds for Opposing Summary Judgment

Plaintiff contests UPS's characterization of preemption in the context of air-carrier liability. He argues that deregulation in the airline industry weakens defendant's reliance on North American Phillips,[4] and that, in any event, the exception to preemption for

_____

of Milwaukee, Wis., 406 U.S. 91, 100 (1972). Thus, federal jurisdiction, uncontested by either party, is proper.

Some cases apply the Carmack Amendment, 49 U.S.C. § 13506, to determinations of common carrier liability for lost or damaged packages. See, e.g., Polesuk v. CBR Sys., Inc., 2006 WL 2796789, at *8 (S.D.N.Y. Sept. 29, 2006). When passed, the Carmack Amendment preempted state regulation of ground transportation by common carriers. See Sam Majors, 117 F.3d at 926. In holding that federal common law governs liability for air carriers for lost or damaged items, the Second Circuit did not address the possible impact of this Amendment. See Nippon Fire, 235 F.3d at 59. It cited, however, to Sam Majors, among other cases, for support for this proposition. Id. The Sam Majors court, in arriving at the conclusion that federal common law governed, said that after the Carmack Amendment was passed to govern ground shipments, "federal regulation was expanded to include air carriers," and went on to say that following a number of federal statutes regulating air carriers, a body of federal common law developed that governed lost or damaged shipments. Sam Majors, 117 F.3d at 926-28. District courts within the Second Circuit have concurred with the assessment that the Carmack Amendment applies to ground shipments while federal common law applies to air shipments, see Desardouin v. United Parcel Serv., Inc., 285 F. Supp. 2d 153, 164 n.11 (D. Conn. 2003), as have courts of appeals in other circuits. See, e.g., Treiber & Straub, Inc. v. United Parcel Serv., Inc., 474 F.3d 379, 383 (7th Cir. 2007); Kemper Ins. Co. v. Fed. Express Corp., 252 F.3d 509, 514 n.5 (1st Cir. 2001) (collecting cases). As the Treiber court stated, when the plaintiff in that case selected "Next Day Air," he took the dispute outside of Carmack Amendment jurisdiction. Treiber, 474 F.3d at 383. Plaintiff here also selected "Next Day Air." See p. 5, supra.

[4] In North American Phillips, a 1978 Second Circuit case decided prior to airline deregulation, the Court observed that

self-imposed obligations, carved out in <u>American Airlines, Inc. v.
Wolens</u>, 513 U.S. 219, 232 (1995), applies at least to his breach-
of-contract claims. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for
Summ. J. 2-5.) Plaintiff asserts in the alternative that even if
federal law, and by extension UPS's Tariff, applies, UPS must give
reasonable notice of the Tariff terms and it did not do so in this
case. (<u>Id.</u> at 5-9.) In support of this contention, plaintiff argues
that the fact that UPS insured and shipped the package negated any
notion of constructive notice. (<u>Id.</u> at 5-6.) He further asserts
that he did not receive reasonable notice under the <u>Sam Majors</u>
test. (<u>Id.</u> at 7-9.)


   C. <u>Federal Common Law Preemption of State-Law Claims</u>
      <u>Against Air Carriers</u>


      1. <u>Aviation Preemption Principles</u>


   In determining the scope of preemption in the context of the
aviation industry, we begin with the preemption provision of the
Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713 (1978),
which reads:

      Except as provided in subparagraph (B), a

---

"Congress has created a broad, comprehensive scheme covering the
interstate shipment of freight, aimed at preventing preferential
treatment among shippers and establishing national equality of
rates and services. This has occupied the field to the exclusion
of state law." 579 F.2d at 233-34.

> State . . . may not enact or enforce a law,
> regulation, or other provision having the
> force and effect of law related to a price,
> route, or service of an air carrier or carrier
> affiliated with a direct air carrier . . .
> when such carrier is transporting property by
> aircraft or by motor vehicle . . . .

49 U.S.C. § 41713(b)(4)(A).[5] As the Supreme Court has noted, this provision "bars state-imposed regulation of air carriers." Wolens, 513 U.S. at 222.

The purpose of the statute is to promote uniformity in aviation regulation, a goal that would be frustrated if different states could impose varying requirements on carriers with respect to rates, routes and services. See, e.g., N. Am. Phillips Corp., 579 F.2d at 232-33; see also U.S. Gold Corp. v. Fed. Express Corp., 719 F. Supp. 1217, 1223 (S.D.N.Y. 1989) ("The validity and essential rationale of North American Phillips and similar cases . . . has not been eliminated by deregulation."); Finestone v. Cont'l Airlines, Inc., 195 Misc. 2d 795, 796-97, 759 N.Y.S.2d 623, 625

---

[5] Subparagraph (B) relates to state regulation of motor vehicles on the issues of highway route controls or limitations and mandatory motor vehicle insurance coverage, as well as the transportation of household goods, defined elsewhere in the statute as "personal effects and property used or to be used in a dwelling." 49 U.S.C. § 13102(10). The general understanding is that the household-goods exception is intended to apply to moving companies rather than to air carriers. See 5 West's Federal Administrative Practice § 5459 n.2 (4th Ed. 2006) (citing United Parcel Serv., Inc. v. Flores-Galarza, 385 F.3d 9 (1st Cir. 2004)).

(N.Y. App. Term 2d Dep't 2003) (applying federal law and quoting Nippon Fire, 235 F.3d at 59, for the proposition that "federal common law continues to control the issue of liability of air carriers for lost or damaged shipments even after deregulation"). Consistent with that goal, the Supreme Court has held, in keeping with the statutory language, that the ADA's paramount federal interest in uniformity within the aviation industry trumps state policies "having a connection with or reference to . . . 'rates, routes, or services' . . . ." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992). The Court further noted that the statutory term "[r]elating to" should be interpreted as "broad [in] scope" and with an "expansive sweep." Id. at 383-84.

Despite the apparently sweeping nature of federal preemption, the Court has limited its scope in two important ways. In Morales, while the Court characterized the "relating to" language quite broadly, it still left the door open for the survival of state-law claims not sufficiently related to rates, routes and services. Id. at 390-91. If state policies impact airline rates, routes or services in "too tenuous, remote, or peripheral a manner," the Court asserted, then federal law does not preempt state law. Id. at 390 (internal quotation marks omitted) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983)).

Morales involved industry guidelines that purported to govern the content and format of airline advertising, frequent flyer rewards programs and compensation for people who surrender their seats to others on over-booked flights. Id. at 379. The Court upheld federal preemption, saying that the facts of the case "plainly d[id] not present a borderline question." Id. at 390 (internal quotation marks omitted) (quoting Shaw, 463 U.S. at 100 n.21).[6] The Court declined to go further, however, and "express [] views about where it would be appropriate to draw the line." Id. Since then, the lower courts have struggled to define an effective standard, and the Supreme Court denied certiorari in a 2000 Ninth Circuit case despite conflicting interpretations by the various circuits, leaving the issue unresolved. Nw. Airlines, Inc. v. Duncan, 531 U.S. 1058 (2000) (Mem.); see, e.g., Alshrafi v. Am. Airlines, Inc., 321 F. Supp. 2d 150, 158 (D. Mass. 2004); see also pp. 25-26, infra.

---

[6] The guidelines were devised by the National Association of Attorneys General (NAAG) and were supposed to be enforced through existing state consumer-protection statutes. Morales, 504 U.S. at 378-79. The Court noted that the guidelines mandated, inter alia, clear and conspicuous disclosure of restrictions on advertised fares and some minimal level of availability of advertised fares. Id. at 387-88. Thus, it concluded that "[o]ne cannot avoid the conclusion that these aspects of the guidelines 'relate to' airline rates," both because the guidelines expressly referred to rates and because of the strong economic effect of regulation of advertisements, which contribute to the allocation of resources by informing the public of the "prices of products and services." Id. at 388.

The Supreme Court has also developed a second narrow exception to preemption, holding in American Airlines v. Wolens that "[t]he ADA's preemption clause, . . . read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated." 513 U.S. at 232-33. The Court in Wolens dismissed the plaintiff's reliance on Morales, holding that the facts in Wolens -- involving the terms and conditions of a frequent flier miles program -- clearly fell into the categories of both rates and services. Id. at 226. The Court, however, relied on the words "enact or enforce any law" in the preemption provision, stating that private bargains -- as the Court characterized the frequent flier miles program -- did not constitute state action and therefore fell outside of preemption doctrine when targeted by a breach-of-contract claim. Id. at 226-29. This exception applies, then, only to the terms of bargains negotiated between the parties "with no enlargement or enhancement based on state laws or policies external to the agreement." Id. at 233.

Because the preemption analysis may affect plaintiff's tort and contract claims differently, we address them separately.

21

2. <u>State-law tort claims</u>

Plaintiff asserts claims against UPS for both intentional and negligent tort. He claims, first, that UPS defrauded him in entering into the shipping contract by misleading him into thinking that he could ship the package and that it was insured. Second, he asserts a claim of misrepresentation, arguing that UPS knew that the shipping agreement itself was misleading because it led him to believe that he was covered for any loss when he was not, and that the misrepresentations were intended to induce him to use UPS's services. Third, he asserts that UPS's actions, presumably in losing the ring while it was in the company's possession, constituted negligence. Finally, he claims that this course of conduct involved deceptive business practices and tortious interference with business.

(a) <u>Preemption</u>

UPS argues that the state-law tort claims asserted by plaintiff ought to be governed by federal common law because of the "broad, comprehensive scheme" created by Congress to cover interstate air shipments. (Def.'s Mem. of Law in Supp. 7.) Plaintiff responds that deregulation minimized the breadth of the

22

preemption provision, and that the "related to" language in the statute requires that the state law at issue actually interfere with the federal regulatory scheme. (Pl.'s Mem. of Law in Opp'n 2-3.)

The <u>Wolens</u> exception does not apply to plaintiff's state-law tort claims. <u>Wolens</u> held that routine breach-of-contract claims could survive preemption if they were premised on a self-imposed undertaking by the carrier. <u>Wolens</u>, 513 U.S. at 232-33; <u>cf. also</u> <u>Taj Mahal Travel, Inc. v. Delta Airlines, Inc.</u>, 164 F.3d 186, 191-92 (3d Cir. 1998). In addition, although the opinion of the Court did not directly address the application of its ruling to common-law state economic tort claims, it did consider a claim under the state's consumer-fraud statute, holding in substance that the enforcement of such a statute interfered with the goal of federal deregulation and therefore was preempted. <u>Wolens</u>, 513 U.S. at 227-28.[7] Meanwhile, both concurring opinions did specifically address state-law tort claims and indicated that the exception was limited to contract claims.

---

[7] Note, as some courts have done, that the distinction in <u>Wolens</u> was not between common law and statutory law, but rather between private agreements and substantive state rules. <u>See</u>, <u>e.g.</u>, <u>Travel All Over the World, Inc. v. Kingdom of Saudi Arabia</u>, 73 F.3d 1423, 1435 (7th Cir. 1996). Justice Stevens explicitly makes this point in his concurrence and dissent. <u>Wolens</u>, 513 U.S. at 236 ("I would analogize the Consumer Fraud Act to a codification of common-law negligence rules.") (Stevens, J., concurring in part and dissenting in part).

Justice Stevens, who concurred with the Court's resolution of the breach-of-contract claim, disagreed with the Court's conclusion that the consumer-fraud claim was preempted by the federal statute. See id. at 235 (Stevens, J., concurring in part and dissenting in part). He characterized the distinction that the Court made as one between, on the one hand, breach-of-contract claims, and, on the other, "private tort actions based on common-law negligence or fraud, or on a statutory prohibition against fraud," both of which he believed were not preempted because they reflected private claims rather than direct state regulation. Id. This analysis suggests that the Wolens exception applies to breach-of-contract claims only, an inference strengthened by Justice Stevens's criticism that the characterization of the claim as one of contract rather than tort does not change the fact that "the two claims are grounded upon the exact same conduct and would presumably have an identical impact upon [the airline's] rates, routes, and services." Id. at 236.[8]

---

[8] A Seventh Circuit case made the argument more pointedly, noting that the decision in Wolens did not rest on whether the contract related to rates, routes and services but rather on whether it was couched in the language of private contracts as opposed to enactment or enforcement of state law. Travel All Over the World, 73 F.3d at 1432. The Court stated that it "recognize[d] that the plaintiffs' intentional tort claims [were] based on the same underlying conduct as their contract claim, which is not preempted . . . . However, while Wolens protects contract claims that seek to enforce private agreements from preemption, it does not similarly shelter tort claims." Id. at 1435.

Justice O'Connor, who concurred with the Court's resolution of the consumer-fraud claim but not the breach-of-contract claim, addressed the issue slightly more obliquely, arguing that both contract law and either statutory- or common-law-governed torts are laws and therefore should be subject to preemption if they meet the Morales requirements. Id. at 241-42. She thus suggested that the majority was distinguishing based on the type of claim asserted rather than the factual basis for that claim. It appears, then, that Wolens cannot apply to plaintiff's state-law tort claims.

The Morales exception also does not help plaintiff avoid preemption of his state-law tort claims as they relate to the loss of his shipment. The question is whether plaintiff's tort claims fall under the exception contemplated by Morales for claims classified as not directly related to rates, routes and services.[9] The Second Circuit has held, in the wake of Morales, that federal common law "continues to control the issue of liability of air

_____

[9] Recent case law suggests that personal-injury negligence claims, for example, are not preempted under Morales. See, e.g., Shupert v. Cont'l Airlines, Inc., 2004 WL 784859, at *3 (S.D.N.Y. Apr. 12, 2004) (noting that the Second Circuit has not ruled on the "breadth of the ADA express preemption clause," but that "a number of other courts have held that personal injury negligence cases and other state tort cases are outside its scope, and are therefore not preempted"). Other state-law tort claims that have been found not to be preempted are intentional interference with a custodial relationship, intentional infliction of emotional distress and false imprisonment. See, e.g., Pittman v. Grayson, 869 F. Supp. 1065, 1074 (S.D.N.Y. 1994).

carriers for lost or damaged shipments even after deregulation." Nippon Fire, 235 F.3d at 59; see also Finestone, 195 Misc. 2d at 796-97, 759 N.Y.S.2d at 625. This result, although not explained by the Court in Nippon Fire, plainly follows from the notion that state-law claims that significantly affect airline economics interfere with the purposes behind deregulation, and in fact state policies that purport to regulate when and how an air carrier may limit liability have been found to so interfere. See, e.g., Finestone, 195 Misc. 2d at 798, 759 N.Y.S.2d at 625-26 (citing, inter alia, Read-Rite Corp., 186 F.3d at 1198; Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1261, 1265 (9th Cir. 1998)); see also Eli Lilly Do Brasil, LTDA v. Fed. Express Corp., 2005 WL 2312547, at *3 (S.D.N.Y. Sept. 21, 2005) (stating that, though the Second Circuit did not explain its rationale in holding as it did in Nippon Fire, the fact that the result was the same as in Read-Rite suggested that the Second Circuit relied on the relationship between loss of or damage to cargo and the "rates, routes, and services" standard, as well as the impact of permitting state regulation of air carriers' limitation of liability on economic deregulation).

Plaintiff asserts a variety of both intentional and negligent tort claims. All such tort claims are preempted when based on loss of, or damage to, a shipment of cargo. Thus, for example, in Nippon

26

Fire, 235 F.3d at 60, the Second Circuit noted that limitation of liability clauses "limit recovery . . . based on . . . legal theories, including negligence, bailment, or conversion," as well as claims sounding in breach of contract. Similarly, Wolens made it clear that fraud claims, when based on loss of or damage to shipped items, are preempted by the ADA. See Wolens, 513 U.S. at 228 (noting that plaintiff's claims under the Consumer Fraud Act were preempted); see also pp. 22-25 & n.7, supra (discussing the notion that whether preemption is found depends on the type of claim rather than the distinction between statutory law and common law). Thus, federal common law preempts any tort claims asserted by plaintiff to the extent that he bases them on the loss of his shipment.[10]

Although Feldman does not explicitly assert any federal-law claims, for the purposes of our analysis we read a federal-law negligence claim into his complaint based on his allegation about the loss of his property. Thus, we must examine the effect of the presence of the UPS Tariff and, should it apply, whether plaintiff is bound by its terms.

---

[10] Note that to the extent that plaintiff's fraud-in-the-inducement claim is based on breach of an insurance agreement, it falls outside of the "rates, routes and services" field, and is therefore not preempted. See p. 61, infra.

(b) <u>Application of the Tariff</u>

UPS argues (1) that the UPS Tariff limits its liability and (2) that plaintiff had constructive or reasonable notice of the provisions of that Tariff. We agree with the first proposition but conclude that there remain triable issues of fact that are material to the second proposition.

(i). <u>The Reach of the Tariff</u>

UPS contends that the UPS Tariff is the sole determinant of plaintiff's right to recovery. (Def.'s Reply Mem. in Further Supp. 6.) It is well-settled that a valid tariff incorporated into a shipping contract constitutes a binding contractual tie between the carrier and the shipper, <u>I.L.T.A., Inc. v. United Airlines, Inc.</u>, 739 F.2d 82, 86 (2d Cir. 1984), and that limitations on liability "in a contract of carriage appl[y] whether the action sounds in tort or contract." <u>Welliver v. Fed. Express Corp.</u>, 737 F. Supp. 205, 207 (S.D.N.Y. 1990); <u>accord</u> <u>Nippon Fire</u>, 235 F.3d at 60 ("[Valid limitation of liability clauses] limit recovery not only for breach of contract, but also based on other legal theories, including negligence, bailment, or conversion."). Moreover, under federal common law, "valid federal tariffs . . . govern not only the nature and extent of [the carrier's] liability but also the

28

nature and extent of the shipper's right of recovery." <u>N. Am. Phillips Corp.</u>, 579 F.2d at 233; <u>accord</u> <u>S. Pac. Transp. Co. v. Commercial Metals</u>, 456 U.S. 336, 342 (1982); <u>Sam Majors</u>, 117 F.3d at 930; <u>Tishman & Lipp, Inc. v. Delta Air Lines</u>, 413 F.2d 1401, 1403-04 (2d Cir. 1969). This is true again without regard to whether the claims sound in negligence or in intentional tort. <u>See</u> <u>U.S. Gold Corp.</u>, 719 F. Supp. at 1225; <u>see also</u> <u>King Jewelry, Inc. v. Fed. Express Corp.</u>, 316 F.3d 961, 964-65 (9th Cir. 2003); <u>Wagman v. Fed. Express Corp.</u>, 844 F. Supp. 247, 250 (D. Md. 1994), <u>aff'd</u>, 47 F.3d 1166 (4th Cir. 1995).

Any document that constitutes a contract between the parties may limit liability through reference to an extrinsic document. <u>Sam Majors</u>, 117 F.3d at 930-31 & n.17; <u>Treiber & Straub, Inc. v. United Parcel Serv., Inc.</u>, 2005 WL 2108081, at *6 (E.D. Wis. 2005). Courts have found that if a shipping contract makes "express reference" to terms and conditions of a tariff, the relevant tariff is effectively incorporated into the contract. <u>Compare</u>, <u>e.g.</u>, <u>Sam Majors</u>, 117 F.3d at 930 (finding that when the air bill expressly directed the customer to view the terms and conditions on the back of the form, the terms became part of the contract), <u>with</u> <u>E.J. Rogers, Inc. v. United Parcel Serv., Inc.</u>, 338 F. Supp. 2d 935, 939 (S.D. Ind. 2004) (finding that the tariff was not incorporated into the contract between the parties where there was no reference to

29

"extrinsic documents" in the air bill).

To determine what recovery plaintiff has available to him, then, we must examine the contract that governed the rights of these parties and any documents incorporated by reference into that contract, including valid federal tariffs. In this case, the relevant portion of the UPS Tariff is Item 460, which provides that "[a]rticles of unusual value shall be deemed to include any package having an actual value of $50,000," and that "UPS will not be liable for any loss of, or damage to, articles of unusual value." (Stubits Aff. Ex. D at 8.) Defendant argues on this basis that it is not liable to plaintiff for loss of, or damage to, this package. Plaintiff does not contest that his shipment was valued at more than $50,000 and hence was an "article of unusual value" (Compl. ¶ 40), but he contends that the Tariff does not bar tort liability against UPS in his case because he did not have adequate notice of its terms.

### (ii) Notice

In resisting plaintiff's argument that notice was lacking, UPS offers two arguments. First, it asserts that plaintiff was charged with constructive notice of the terms of the Tariff solely by virtue of the existence of the published Tariff. (Def.'s Mem. of

30

Law in Supp. 12-13.) According to defendant, it is not necessary that the shipper have actual notice of the provisions; rather, because the Tariff was published, and because it prohibited articles such as those shipped by the plaintiff, summary judgment ought to be granted. (Id.) Second, defendant argues that the plaintiff received reasonable notice, as determined by the so-called Sam Majors test. (Def.'s Mem. of Law in Supp. 13-16.)

In response, plaintiff argues that the mere existence of a tariff is insufficient to provide notice, and that the surrounding circumstances of the transaction in this case -- particularly the details of his interaction with the UPS employee -- suggest that he "cannot be deemed to have [had] notice." (Pl.'s Mem. of Law in Opp'n 5-6.) Therefore, plaintiff asserts that whether he received reasonable notice is a triable issue of fact.

Under basic contract law, UPS need not show that plaintiff actually knew the terms of the agreement or even that he read the agreement, but instead can make out a prima facie case by showing that the plaintiff accepted and used a ticket or air bill, containing terms or incorporating outside terms by reference that were placed before him. Sam Majors, 117 F.3d at 930. The outside terms need not even be part of the air bill; rather, notice of the terms is sufficient so long as the terms are provided during the

31

process that leads to the acceptance of the ticket. Thus, the court may find adequate notice if the customer is required to agree to the terms as one of the steps in accepting that ticket and those terms are made available to him during the contracting process. See, e.g., Treiber, 2005 WL 2108081, at *7-*8 (finding that "the focus does not rest entirely on the air bill" and that notice was sufficient where the plaintiff was required to agree to terms and conditions to utilize the shipping service, those terms included the tariff, which was made available to the customer on the website that he was using, and the plaintiff was required to click twice to agree to these terms). Nevertheless, "the mere existence of a tariff, without more, is not sufficient to limit or avoid liability." E.J. Rogers, 338 F. Supp. 2d at 941. As the court in E.J. Rogers observed, constructive notice, or the assumption that a shipper was on notice of limitation-of-liability terms in a tariff merely because that tariff was published, is insufficient without a more searching analysis of whether the tariff was referenced in any documentation provided by the shipping company to the shipper. Id. at 940-41. Thus, despite the uncontested existence of the published UPS Tariff, to prevail on summary judgment, UPS still must prove that the facts, construed in a light most favorable to the plaintiff, conclusively meet the standard for reasonable notice.

The Second Circuit has adopted a "reasonable communicativeness" test, originally expounded by Judge Friendly in Silvestri v. Italia Societa Per Azioni di Navigazione, 388 F.2d 11, 14-17 (2d Cir. 1968). In substance, the Second Circuit held that the wording of the carriage agreement alone is insufficient to establish notice and that the court must also consider whether the carrier has "done all it reasonably could" to advise the customer of the terms of the agreement. Id. at 17. This test determines whether a customer is contractually bound to the fine-print of a common carrier's limitation of liability, and it has been widely adopted in the shipping context. See Sam Majors, 117 F.3d at 930; Deiro, 816 F.2d at 1364; Shankles v. Costa Armatori, S.P.A., 722 F.2d 861, 863-67 (1st Cir. 1983); Barbachym v. Costa Line, Inc., 713 F.2d 216, 219 (6th Cir. 1983). Following what it characterized as the acceptance of a "two-part test" by a number of circuits, the Second Circuit expressly adopted this test in 2001, finding it to be a "satisfactory refinement of Judge Friendly's holding in Silvestri" and noting that it had already been used by a number of district courts in the circuit. Ward v. Cross Sound Ferry, 273 F.3d 520, 523-24 (2d Cir. 2001). The language adopted by the Second Circuit mirrors that of the Fifth Circuit in Sam Majors, see p. 34, infra, the case that is most frequently cited in shipping cases as

the source of the two-part test. See id. at 523.[11]

The so-called Sam Majors test requires that the court first assess the "physical characteristics of the airbill" "to determine whether they provide reasonable notice to the customer." Sam Majors, 117 F.3d at 930. The court must then consider "the conditions under which the shipment was made." Id. Such surrounding circumstances include "the passenger's familiarity with the ticket, the time and incentive under the circumstances to study the provisions of the ticket, and any other notice the passenger received outside of the ticket." Ward, 273 F.3d at 525; see Sam Majors, 117 F.2d at 930. Necessarily, this test requires a fact-intensive inquiry. See Stein Jewelry Co., 228 F. Supp. 2d at 307-08.

UPS argues that the facts in the present case meet the test

---

[11] The facts of Ward involved another kind of common carrier, a passenger ferry. The Second Circuit's language, tailored to that situation, was the following:

> (1) whether the physical characteristics of the ticket itself "reasonably communicate[d] to the passenger the existence therein of important terms and conditions" that affected the passenger's legal rights, and (2) whether "the circumstances surrounding the passenger's purchase and subsequent retention of the ticket/contract" permitted the passenger "to become meaningfully informed of the contractual terms at stake."

Ward, 273 F.3d at 523 (alteration in original) (quoting Shankles, 722 F.2d at 864-66).

for reasonable notice beyond a triable dispute. We disagree.

The UPS representative, Evangeline Melvin, directed Mr. Feldman to complete his shipping labels on the I-Ship Online Shipping System. (Feldman Dep. 71:3-6.) The I-Ship system permits users to enter shipping information in the first two quadrants and then, in the third quadrant, to enter "[a]dditional [s]hipping [i]nformation," including the package value and whether the shipper would like to purchase insurance protection over $100. (Melvin Aff. ¶¶ 9-13 & Ex. 2.) The fourth quadrant includes, in addition to the button that permits the shipper to print the label, a hyperlink that reads "Terms of Service." (Id. ¶¶ 15-16 & Ex. 3.) Clicking on that hyperlink brings the user to a screen that informs him that once he clicks on "Print," he is accepting the terms of the UPS Tariff, including terms that might limit UPS's liability. (Id. ¶ 17 & Ex. 4.) While the Tariff itself is not hyperlinked, the Terms of Service screen includes the website address at which the Tariff can be found, as well as the advice that the Tariff's terms are available upon request at the counter. (Id.) UPS argues that the reference to the Tariff properly incorporated the Tariff provisions into the air bill's terms and conditions, and that the I-Ship system thus provided adequate notice to plaintiff of the limitation of liability, including the prohibition against shipping items of

unusual value. (Def.'s Mem. of Law in Supp. 14-15.)[12]

For purposes of the reasonable-communicativeness test, we look to the manner in which the controlling contractual terms were displayed to the customer. This includes both the contents of the actual air bill or air bill substitute and the contents of any documents incorporated into that air bill, including a valid tariff. The purpose of this analysis is to determine what information was directly before the plaintiff, in writing, at the time of the transaction. "'[F]ailure of the plaintiff to read the matter plainly placed before it cannot overcome the presumption that the plaintiff assented to the terms of the carrier.' This is basic contract law: one cannot accept a contract and then renege based on one's own failure to read it." Treiber, 474 F.3d at 385 (quoting Treiber, 2005 WL 2108081, at *8).

In this case, to produce the required printing label from UPS's I-Ship system, the shipper had to click the "Print" button, above which is located an allegedly clear and conspicuous warning:

_____

[12] The fact that this transaction potentially involved the internet does not change the analysis. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) (stating that internet commerce "has not fundamentally changed the principles of contract. . . . [W]hen a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree.").

"Review everything carefully and then click **Print** to print your shipping request." (Melvin Aff. Ex. 3.) A hyperlink labeled "Terms of Service" is located directly below the "Print" button. (Id.) If the customer clicked on the "Terms of Service," however, he did not see these terms on the screen, or that page, but rather saw a statement that the shipper is bound to the terms of the UPS Tariff agreement, which, according to the prompt on the screen, can be viewed at www.ups.com or obtained upon request from the UPS counter associate. (Id.)

If the customer arranged to actually see the terms of service and find the reference to the Tariff -- and access it -- he would discover, in the twenty-eight pages of the Tariff, an Item 460, which states that "any package having an actual value of more than $50,000" may not be shipped. (Stubits Aff. Ex. D at 8.)[13] The record on this motion is silent as to whether the computer had an internet browser.[14] Thus, we must assume for present purposes that plaintiff

---

[13] Although the provision applicable in this case is denoted as "Item 460," the Tariff contains an easily navigable Table of Contents and is twenty-eight pages in aggregate. (Stubits Aff. Ex. D & Ex. D at 1-2.)

[14] Indeed, UPS's counsel conceded as much at oral argument. (See Tr. 32, Feb. 26, 2007 (UPS's counsel stating that there was nothing in the record addressing the question of whether the computer had an internet browser); Melvin Aff. ¶ 20 (stating that the Tariff and other terms were available at the UPS website, but giving no information as to the internet access available at the computer station). But see Tr. 23 (UPS's counsel stating to the Court that the computer station had access to the UPS internet

would have been unable to access the actual terms of service, including the liability limitation, on the website while standing at the computer terminal. Moreover, the record says nothing about whether the counter associate in this case had a copy of the terms at the counter.[15]

The "physical characteristics" portion of the test focuses on the language itself and the positioning and actual availability of the terms. A number of courts have found that language and positioning similar to that provided here, insofar as it makes reference to a tariff that provides governing terms, satisfies the "physical characteristics" prong of the test. See, e.g., Treiber, 474 F.3d at 385 ("Our examination of the relevant pages from UPS's website satisfies us that UPS provided adequate notice that customers were not permitted to ship items of 'unusual value' (meaning worth more than $50,000) and that UPS would not be liable" where the customer had to click twice to agree to abide by the terms and conditions before shipping). Conversely, however, in a

_____

system).)

[15] Again, counsel conceded this point at oral argument. (See Tr. 46.) In her affidavit, Ms. Melvin does note that "[a] copy of the UPS Tariff, Service Guide, and Terms of Service Information is available to the shipper at any time upon request." (Melvin Aff. ¶ 19.) This statement, however, essentially parrots the information given through the I-Ship system (see Melvin Aff. Ex. 4) and makes no specific reference to the availability of the terms of the Tariff in this case.

number of these cases, the placement of the provision was far more prominent. <u>See</u>, <u>e.g.</u>, <u>King Jewelry</u>, 316 F.3d at 966 (concluding, in a case involving a nearly identical limited-liability provision, that the provision provided reasonable notice of the limits on liability where the terms and conditions themselves were in the air bill and the Service Guide); <u>Sam Majors</u>, 117 F.3d at 930 (holding, in a case with a very similar limited-liability provision, that there was reasonable notice where the "airbill contained a conspicuous notice on the front directing the customer to the terms and conditions printed on the reverse . . . . [and] the back of the notice incorporated by reference a service guide that was readily available, and written in plain language").

Plaintiff points to a decision from the Southern District of Indiana to support the proposition that the UPS Tariff was not properly incorporated into the shipping contract. <u>See</u> <u>E.J. Rogers</u>, 338 F. Supp. 2d 935. In <u>E.J. Rogers</u>, however, UPS failed to make any reference to its tariff in any of its shipping documents, <u>see</u> <u>id.</u> at 939; therefore, the notice analysis was quite different. (<u>See</u> Melvin Aff. Ex. 4 (showing that the Tariff is clearly referenced on the screen that one accesses by clicking on the "Terms of Service" hyperlink).)

What was actually directly before the plaintiff in this case,

however, including what was "readily available" to him, see Sam
Majors, 117 F.3d at 930, remains uncertain on the record before us.
As noted, there was no evidence in the record as to whether the I-
Ship computer had an internet browser that would have permitted
plaintiff to access the UPS Tariff online. (Tr. 32.) Moreover, the
record did not reflect whether the counter associate actually had
a copy of the Tariff at the counter. (Id. at 46.) Thus, the
accessibility of the referenced terms to plaintiff -- which may
well determine whether or not UPS provided reasonable notice --
remains a triable issue of fact.

Moreover, the record regarding the other pertinent
circumstances of plaintiff's dealings with UPS -- important to the
analysis of the second part of the test -- also raises more
questions than it answers. This aspect of the "reasonable
communicativeness" test requires a more fact-intensive analysis
than the first. The First Circuit emphasized that the "proper test
of reasonable notice is an analysis of the overall circumstances on
a case-by-case basis, with an examination not only of the ticket
itself, but also of any extrinsic factors indicating the
passenger's ability to become meaningfully informed of the
contractual terms at stake." Shankles, 722 F.2d at 866.

In determining whether the surrounding circumstances

40

constitute reasonable notice, courts have looked to whether the
plaintiff had ready access to the terms and therefore may be deemed
to have assented. See, e.g., Treiber, 474 F.3d at 385; Mudd-Lyman
Sales and Serv. v. United Parcel Serv., 236 F. Supp. 2d 907, 911
(N.D. Ill. 2002). In Treiber, for example, the shipper had to
initially click to agree to the terms and conditions to get onto
the website, and was then required to assent to the terms again to
send a shipment using the website. Treiber, 2005 WL 2108081, at *3.
Rather than using an I-Ship system, the plaintiff in Treiber
shipped the package through the UPS website itself, on which both
the terms and conditions and the tariff referenced in them were
available. Treiber, 474 F.3d at 381-82; Treiber, 2005 WL 2108081,
at *3, *7. Both the District Court and the Seventh Circuit
emphasized that the shipper had to "click . . . to agree" twice and
that assent was clear because the shipper had to explicitly agree
to terms that were clearly accessible. See Treiber, 474 F.3d at
382, 385 ("The fact that Straub had to agree not once, but twice,
to abide by the terms and conditions . . . is enough to ensure that
Treiber had clear and reasonable notice of the rules. The Terms and
Conditions of Service repeat the disclaimer of liability several
times and refer pointedly to the pertinent parts of the Tariff,
which is also available on the UPS website."); Treiber, 2005 WL
2108081, at *7-*8 (stating that the tariff "is set forth on the UPS
website" and that the plaintiff "was required to agree to the terms

41

and conditions, including the tariff, [as] set forth on the website" when logging into the website and when making a shipment, thus indicating that "the plaintiff had reasonable notice of the liability limitations").

These circumstances are distinguishable from the present case. The instructions on the I-Ship System used by plaintiff directed the shipper: "Review everything carefully and then click **Print** to print your shipping request." A hyperlink, labeled "Terms and Conditions," appeared immediately below the "Print" button. The instruction to click on the word "Print," however, does not necessarily connote agreement or assent. Rather, for example, one might interpret the directions to mean that the shipper is being asked to confirm and carefully review the addresses before printing the shipping label. "Print" is not an unambiguous direction, as "I Assent," for example, would be. Cf., e.g., Mudd-Lyman, 236 F. Supp. 2d at 911 (finding adequate notice where shipper had to both break the seal on shipping software that contained the statement, "By breaking this seal, you indicate your agreement [to the terms and conditions]," and click "Yes" in response to the question "Do you accept all the terms of the preceding license agreement[?]"). Feldman was not informed that clicking the "Print" button in fact constituted assent to all terms unless or until he clicked on the terms and conditions. Moreover, it is again not clear that

42

plaintiff was able to access the terms of the Tariff before printing, as it remains a question of fact whether the computer was internet-accessible and whether the counter attendant actually had the terms available at the counter.

Another of the surrounding circumstances to be taken into account is any other notice that the plaintiff received outside of the shipping contract itself. In finding adequate notice, the Seventh Circuit in Treiber distinguished a hypothetical that might well resemble the facts of this case, saying, "It would be different if, for example, Treiber arranged for the shipment in a face-to-face transaction and was never given a copy of or required to agree to abide by the Terms and Conditions of Service." Treiber, 474 F.3d at 385. To similar effect is E.J. Rogers, where the court found that the fact that the customer told the UPS employee, in a face-to-face interaction, the value of the item and the UPS employee then accepted it for shipping, and also accepted additional payment to insure the item, supported the plaintiff's argument that he had been denied reasonable notice of liability limitations (with the added factor of the absence of an explicit reference to the applicable tariff in the relevant shipping document). E.J. Rogers, 338 F. Supp. 2d at 940.

It is not clear from the record whether the facts of this case

43

resemble the facts in <u>Treiber</u> or more closely parallel the <u>Treiber</u> court's hypothetical and the facts in <u>E.J. Rogers</u>. We construe the evidence in the light most favorable to plaintiff in this analysis, and it suggests that the notice given to plaintiff and its adequacy are triable issues.

Plaintiff testified that he actually sought the advice of Ms. Melvin and offered to show her the contents of the package. (Feldman Dep. 71:6-10.) Moreover, he testified that he told her that the package was worth $57,000, that she attempted to insure it for that amount and that she then told him, in substance, that the computer would take only up to $50,000. (<u>Id.</u>) According to plaintiff, Ms. Melvin then agreed to ship the diamond ring at his request. (<u>Id.</u> 71:21-25.) These facts, if proved, implicate a substantial face-to-face communication, suggesting that the surrounding circumstances might have prevented the plaintiff from having adequate notice of the terms of the Tariff.[16]

---

[16] Ms. Melvin's account differs in certain respects from plaintiff's. In her deposition, she noted that she only vaguely remembered a couple "coming in, going to the Iship computer, and then coming to the register and requesting an next day airbox," but did not recall any particular interaction with them. (Melvin Dep. 27:8-28:9, 35:20-23.) She did say, however, that she did not recall any customer ever saying that he wanted to insure a package for more than $50,000 or that his package was worth more than $50,000 but that he wanted $50,000 worth of insurance; she further testified that if someone were to tell her that the value of a package was more than $50,000, "we let them know that we cannot accept it." (<u>Id.</u> at 22:20-24:1.) Whatever may be the actual facts of Feldman's encounter with Ms. Melvin, for purposes

It can fairly be argued that plaintiff had good reason to familiarize himself with the terms of the Tariff because of the value of the package involved, a fact that other courts have considered in their analysis. See, e.g., Deiro, 816 F.2d at 1365 (describing the reasons why someone shipping a valuable package would examine the terms closely). However, according to plaintiff's testimony at his deposition, he attempted to clarify the terms by conferring with the counter attendant and was not told of the prohibition on shipping his diamond ring. Thus, the case still turns on the open question of whether plaintiff was given a reasonable opportunity to learn of the limitation in question, and this remains a disputed question of fact.

Because this analysis is fact-intensive, and because there remain a number of factual ambiguities whose resolution is necessary to decide the question of reasonable notice, we cannot grant summary judgment on the applicability of the limitation-of-liability provision of the Tariff. It follows that summary judgment cannot dispose of plaintiff's federal-law negligence claim for loss of the diamond ring.

---

of the current motion, we must assume the accuracy of plaintiff's account.

3. <u>Plaintiff's Breach-of-Contract Claims</u>

Plaintiff asserts a breach-of-contract claim against UPS based on the allegations (1) that UPS had a contractual covenant and/or duty to act in good faith and deal fairly with the plaintiff, and (2) that it failed to carry out its obligations and/or duties to deliver the diamond ring. (Compl. ¶¶ 96, 99.) Although plaintiff does not explicitly plead a breach-of-contract claim relating to his purchase of insurance from UPS, it is implicit in his pleadings, and we therefore consider it as well. (<u>See</u> <u>id.</u> ¶¶ 40-42.)

UPS argues that all state-law claims, including any breach-of-contract claims, are preempted by federal law. (Def.'s Mem. of Law in Supp. 7-9.) It further asserts that, if federal law controls, the Tariff governs plaintiff's right of recovery insofar as it functions as the agreement between the parties, and that the terms of the Tariff preclude any recovery. (<u>Id.</u> at 9.)

Plaintiff responds that the Supreme Court held that state-law contract claims are not preempted under <u>Wolens</u>. (Pl.'s Mem. of Law in Opp'n 4.) He argues that the actions of UPS constitute self-imposed undertakings and therefore are not attempts by the state to regulate rates, routes and services. (<u>Id.</u>)

46

(a) <u>Preemption of Breach-of-Duty Claim</u>

To the extent that plaintiff frames his breach-of-duty claim as a state-law breach-of-contract claim, we find the claim to be preempted. While the ADA does not preempt the use of state contract law to interpret private contracts, a claim such as this one "is preempted because it seeks to add to the terms of [UPS's] contractual obligations," which "would constitute an enlargement of [UPS's] obligations based on state policies external to the agreement." <u>A.I.B Express, Inc. v. FedEx Corp.</u>, 358 F. Supp. 2d 239, 253 (S.D.N.Y. 2004).

Therefore, we grant summary judgment on plaintiff's claim for breach of the covenant or duty of good faith and fair dealing.

(b) <u>Preemption of Breach-of-Contract Claims</u>

In <u>Wolens</u>, the Supreme Court held that air carriers could be held liable for breach of contract under state law for obligations that were self-imposed rather than imposed by the state. <u>Wolens</u>, 513 U.S. at 228-29. Though the application of this distinction is, in practice, less than straightforward, the use of substantive state contract law to interpret agreements between the parties does not amount to a state-imposed obligation as defined in <u>Wolens</u>. For

47

example, in <u>In re JetBlue Airways Corp. Privacy Litig.</u>, the court rejected the air carrier's argument that resort to contract interpretation under state law brought the claim within the scope of preemption. 379 F. Supp. 2d 299, 317 (E.D.N.Y. 2005). It held that such a reading of <u>Wolens</u> would effectively render the exception irrelevant, as "most contractual arrangements that become the subject of litigation present some question that requires resort to general principles of state contract law." <u>Id.</u> Thus, the court found, the "critical distinction between principles of contract law that fall within and without the <u>Wolens</u> exception is whether they seek to effectuate the intent of the parties rather than the State's public policies." <u>Id.</u> (internal quotation marks omitted) (quoting <u>In re EVIC Class Action Litig.</u>, 2002 WL 1766554, at *9 (S.D.N.Y. July 31, 2002)).

Here, plaintiff in substance asserts two breach-of-contract claims, one linked explicitly to UPS's failure to deliver the diamond ring and the other linked to the potentially separate agreement to provide insurance for the shipment. We address each separately.

### (i) "Failure to Deliver" Claim

The Second Circuit has held -- along with other courts -- that

48

breach-of-contract claims seeking to avoid a limitation-of-liability clause for loss or damage by air carriers are governed by federal common law. See Nippon Fire, 235 F.3d at 59; N. Am. Phillips Corp., 579 F.2d at 232; accord, e.g., Cash Am. Pawn, L.P. v. Fed. Express Corp., 109 F. Supp. 2d 513, 523 (N.D. Tex. 2000). "Courts have repeatedly and specifically applied federal law after deregulation to determine the enforceability of declared value liability limitations in interstate air carrier contracts of carriage. The weight of authority on this point is clear; federal common law is applicable to the enforcement of [a] limitation of liability provision . . . ." U.S. Gold Corp., 719 F. Supp. at 1224 (internal citations omitted). Thus, the claim that Ms. Melvin's acceptance of the goods constitutes an undertaking by defendant UPS to deliver the diamond ring does not survive preemption. A claim based on loss of cargo, regardless of how it is framed, relates to the very limitation of liability that courts will enforce if adequate notice has been provided. See Cash Am. Pawn, 109 F. Supp. 2d at 523-24. Such a situation can be distinguished from Wolens, as the Treiber Court of Appeals noted:

> The problem is that this case is only nominally about a shipper seeking to enforce a contract that it contends UPS breached. In reality, [plaintiff] wants to use state law to avoid the part of the contract that limits the carrier's liability. Its claim is therefore not for the conventional breach of contract contemplated in Wolens. [Plaintiff] cannot

49

> prevail unless we were to require "enlargement or enhancement [of the contract] based on state laws or policies external to the agreement." . . . Because it would compel a certain kind of service, this would, in effect, be a rule "'having the force and effect of law relating to rates, routes, or services of any air carrier . . .' . . .".

_Treiber_, 474 F.3d at 386-87 (internal citations omitted) (quoting _Wolens_, 513 U.S. at 222-23, 233) (emphasis and alterations in the original).

It follows that plaintiff's contract claim for non-delivery of the diamond ring, treated as arising under federal common law, depends on whether the exclusion of liability found in the UPS Tariff is effective, a question that in turn depends on whether the plaintiff had adequate notice of it. For reasons already discussed, the issue of notice raises a number of triable questions of fact, and hence cannot be resolved on summary judgment. _See_ pp. 30-45, _supra_.

Plaintiff's breach-of-contract claim also raises an issue of oral modification, as UPS points out in its motion for summary judgment. The weight of authority dictates that once an alleged agreement arises under federal common law, oral modification cannot alter the terms of that agreement if the governing tariff has a provision that prohibits such modification. _See King Jewelry_, 166

F. Supp. 2d at 1286; Wagman, 844 F. Supp. at 250; Kan. State Bank
& Trust Co. v. Emery Air Freight Corp., 656 F. Supp. 200, 205 (D.
Kan. 1987); see also, e.g., Interpool Ltd. v. Bernuth Agencies,
Inc., 959 F. Supp. 644, 650-51 (S.D.N.Y.), aff'd, 129 F.3d 113 (2d
Cir. 1997) (unpublished) (citing a similar concept in the context
of an agreement prohibiting oral modification under admiralty law).
The acceptance of plaintiff's package by the UPS counter associate
was in direct contravention of explicit UPS policy as stated in the
Tariff, which could not be modified orally by Ms. Melvin or any
other employee. (See Mitchell Decl. Ex. C at 5 (UPS Tariff Item
400) (stating that the UPS Tariff, Rates and Service Guides,
descriptions of service on the UPS website, which are incorporated
into the Tariff, and the UPS source document for the individual
shipment "together comprise the complete and exclusive agreement of
the parties, except as modified by any existing or future written
agreement between the parties, and may not be contradicted or
modified by any oral agreement").)

     It is unclear, however, whether the written terms governed the
agreement, because the evidence of record does not sufficiently
prove that the plaintiff had adequate notice of the Tariff's terms.
See pp. 30-45, supra. This remains a triable issue of fact, thus
precluding summary judgment. Under federal law, liability cannot be
avoided as a matter of law unless the exclusionary terms of the

Tariff clearly became part of the contract through adequate notice of those terms. Thus, summary judgment on the failure-to-deliver contract claim is denied.

### (ii) <u>Breach of the Insurance Contract</u>

In moving for summary judgment, UPS does not isolate and specifically address the alleged agreement for insurance coverage; rather, in contesting plaintiff's claims, it merely says that all state-law claims are uniformly preempted. (<u>See</u> Def.'s Mem. of Law in Supp. 7-9.)[17] UPS further argues that if the claims are governed by federal law, then the terms of the UPS Tariff apply and govern the plaintiff's right of recovery, preventing him from recovering anything under UPS's "insurance" because he shipped an "article of unusual value," which was prohibited in the Tariff. (Def.'s Mem. of Law in Supp. 9-11.)

We conclude that summary judgment must be denied on this claim. Moreover, this result follows regardless of how the preemption issue is decided.

---

[17] Note that plaintiff does not explicitly isolate the insurance contract either, but he does assert a claim for breach of contract on the theory that UPS failed to provide compensation as promised for his loss, implicitly alleging that defendant failed to perform under an insurance contract. <u>See</u> pp. 7-8, <u>supra</u>, and pp. 60-61, <u>infra</u>.

If we assume the validity of UPS's first argument and find plaintiff's state-law claim for breach of an insurance agreement preempted, genuine issues of material fact nonetheless remain under federal-law principles. UPS argues in its summary-judgment motion that if federal law applies, then the terms of the Tariff govern its liability, including liability based on a breach-of-contract claim. The terms of the Tariff, however, do not, as a matter of law, govern this potentially separate issue of insurance.

Plaintiff argues that "'outside of' the onscreen form plaintiff filled out, Ms. Melvin, an agent of UPS, sold plaintiff $50,000 of 'insurance' for his package, and then shipped it -- all after plaintiff had declared a $57,000 value." (Pl.'s Mem. of Law in Opp'n 9.) This allegation reflects a colorable claim for breach of an insurance agreement, in that the acceptance of plaintiff's money under the alleged circumstances would, if not addressed in the Tariff, constitute a separate insurance contract that would seemingly entitle the customer to the insured amount for which he paid, regardless of whether the package he shipped met the requirements for packages that may permissibly be shipped through UPS.

UPS responds that any such contract would be void, as the company policy was not to provide insurance in such an amount. At

the same time, it refuses to concede that it must then return the money that plaintiff paid to insure the package for $50,000, apparently prepared to have its cake and eat it too. (Tr. at 26:12-29:4); cf. King Jewelry, 316 F.3d at 966 ("Federal Express concedes that to the extent King Jewelry paid Federal Express for excess value protection that it could not receive, Federal Express should return the amount paid.").

Item 537 of the 2003 version of the UPS Tariff, cited in Treiber, stated in pertinent part, "The excess value insurance does not provide any insurance protection for packages or letters having an actual value of more than $50,000 even if a lesser amount is specified in the insured value field in the UPS shipping system used." See Treiber, 474 F.3d at 387; (Supplemental Decl. of Lewis Mitchell in Supp. of UPS's Mot. for Summ. J. Ex. C at 14). The Treiber court relied on this provision in interpreting a breach-of-contract claim for, effectively, breach of an insurance contract, finding that the Tariff terms governed the insurance agreement along with all of the other aspects of the claim.

The 2005 Tariff, in effect at the time that plaintiff shipped the diamond ring, does not have an Item 537. (See Def.'s Supplemental Decl. ¶ 10 & Exhibit B.) Item 535 does address a number of these issues, stating, in pertinent part:

54

> UPS will not be liable or responsible for the
> loss of or damage to any package, the contents
> of which shippers are prohibited from
> shipping, which UPS is not authorized to
> accept, which UPS states that it will not
> accept, or which UPS has a right to refuse. .
> . . Acceptance for carriage of any package
> bearing a declared value in excess of the
> allowed maximums specified in the applicable
> UPS Tariff or Service Guide, or any package
> containing articles that shippers are
> prohibited from shipping or that UPS does not
> or is not authorized to accept for
> transportation, does not constitute a waiver
> of any provision of the Tariff or Service
> Guide limiting UPS's liability or
> responsibility for any such package.

(<u>See</u> Def.'s Supplemental Decl. ¶ 10 & Ex. B at 16-17.) Item 535
also includes the caveat that UPS's maximum liability shall not
exceed the lesser of the declared value; the purchase price, actual
cost or replacement cost; the cost of repair of a damaged item;
$50,000 (unless shipped via drop box, through the internet and
packages that were returned); $500 for international jewelry; and
$999 per package "when Shipper Release is selected." (<u>Id.</u> at 17.)
It does not, however, contain any explicit statements about
limitation of liability for insurance actually purchased. The
Tariff merely provides, in a section that discusses packages'
"protection" by UPS against loss or damage, that one may declare a
higher value and then pay an additional charge if "additional
protection" is desired. (<u>Id.</u>)

At best, the language in the 2005 Tariff is ambiguous and does not support UPS's conclusory argument that the Tariff terms prohibit recovery even up to the amount of insurance actually purchased. This language is clearly different from that referenced in Treiber, where the Tariff explicitly prohibited the purchase of insurance in an amount less than the actual value of a shipped item if the item had an actual value of over $50,000. To the extent that UPS wants to assert that the language referenced in its declaration supports the conclusion that Feldman could not purchase insurance under the Tariff (see Def.'s Supplemental Decl. ¶ 10), it must do so to a factfinder and is not entitled to judgment as a matter of law on this issue.

Even if one could infer that, as a matter of law, the more general statements in the Tariff relating to "liability" effectively governed the insurance contract, such that the Tariff indeed provided the written terms of that contract, we could not grant summary judgment, as the questions about notice of the Tariff terms remain unanswered on the record. First, as a general matter, the same notice analysis discussed above applies -- there remain genuine issues of material fact as to whether the terms of the Tariff were ever effectively before the plaintiff. See pp. 30-45, supra. Moreover, the question of notice is further complicated by the ambiguous nature of the language in the Tariff with respect to

insurance; that ambiguity suggests that even if the applicable terms had appeared on the face of the agreement, that language might not have provided adequate notice. See pp. 54-56, supra. Thus, even if the terms of the Tariff are found to govern the purchase of insurance, summary judgment must be denied because there remain genuine issues of material fact as to notice.

In any event, we cannot adopt UPS's argument regarding preemption of state law on the current motion. The facts do not by any means dictate that we can find the insurance agreement preempted as a matter of law, and therefore we must deny summary judgment.

A claim for breach of an insurance agreement, unlike a claim for breach of the contract of carriage, potentially survives preemption if it is construed as a separate agreement and is not significantly intertwined with the shipping agreement itself. If so, it may be governed by state contract law. The carve-out under Wolens applies to terms that the airline "itself stipulated." Wolens, 513 U.S. at 232-33. As stated above, a limitation of liability on loss of or damage to cargo, regardless of whether a carrier stipulates to its terms, is governed by federal law. See pp. 48-50, supra. Conversely, where carriers make an agreement with stipulated terms that do not involve liability for loss of or

57

damage to shipped goods, the courts may find that these claims fall outside of federal preemption. <u>See</u>, <u>e.g.</u>, <u>Wolens</u>, 513 U.S. at 224-30 (involving a challenge to the retroactive application of recent modifications to an airline's frequent flyer program); <u>JetBlue Airways</u>, 379 F. Supp. 2d at 316-18 (applying JetBlue's privacy policy, which prevented JetBlue from disclosing personal information about its passengers without their consent).

There is little case law on the isolation of an insurance contract from a more general limitation-of-liability provision in a shipping contract, a distinction that might merit a conclusion that one is preempted but not the other. The Seventh Circuit did not adopt this conclusion in <u>Treiber</u>, stating that the insurance contract and the shipping contract in that case were so intertwined (presumably because both were addressed in the Tariff) that one could not apply state law to one claim without affecting the other. <u>Treiber</u>, 474 F.3d at 387. In arriving at this conclusion, however, the court cited to Item 537 of the 2003 Tariff, which, as discussed above, expressly limited the excess value insurance to protecting only items that had an actual value of less than $50,000.

If we infer that the <u>Treiber</u> court's reasoning was that the presence of the limitation on insurance in the same document as the general limitation on liability made the issues too intertwined to

separate, the question then becomes whether, if not governed by the terms of the shipping agreement itself, an agreement on insurance can constitute a separate state-law contract that survives preemption. For that, we look to a situation in which insurance was more clearly negotiated separately.

The breach-of-contract claim in In re EVIC Class Action Litig., 2002 WL 1766554 (S.D.N.Y. July 31, 2002), was asserted by a class of plaintiffs who had purchased excess value insurance on the assurance of UPS that it would remit the fees to an insurance company to purchase insurance for the shipped items. Id., at *2. Plaintiffs alleged that UPS did not do so, but rather deposited the funds into UPS accounts from which other entities "directed and controlled" by UPS benefitted. Id. The complaint on this point, as quoted by the court, stated:

> The EVIC plaintiffs allege that "[t]he UPS
> defendants were contractually obligated to
> remit the funds collected from the plaintiffs
> and other similarly situated customers of UPS
> for excess value insurance to an insurance
> company(ies) as premiums for cargo insurance.
> Plaintiffs and other similarly situated
> customers of UPS each paid UPS fees for excess
> value insurance. UPS breached its promises to
> remit the fees to an insurance company(ies) as
> insurance premiums."

Id., at *9 (quoting EVIC Compl. ¶ 205) (alterations in original). In EVIC, the court found that limitation of liability, in that case as imposed by the Carmack Amendment, 49 U.S.C. § 14706(c)(1)(A)

(2002), did not apply to agreements related to insurance.[18] <u>Id.</u>, at *9-*10. Under the <u>EVIC</u> facts, where insurance was completely separate, federal law did not preempt claims for damages that arose directly from UPS's contracts for insurance. <u>Id.</u>

In the present case, the distinction is not as clear as in <u>EVIC</u>, because the insurance was negotiated, if at all, in conformity with a shipping contract and did not involve a separate insurance contract. Nonetheless, the terms associated with this shipping agreement, as characterized in the record on this motion, are at least ambiguous as to whether they prohibit or even address UPS's ability to make a separate agreement to provide the shipper with insurance, contrary to the facts in <u>Treiber</u>. As a result, whether or not a state-law claim for breach of an insurance agreement survives preemption is affected by whether the Tariff can be interpreted to cover that claim, a question which, as noted above, cannot be determined as a matter of law. If the insurance agreement is found not to be covered by the Tariff, plaintiff can argue that it was a separate agreement and would not be preempted by the ADA, though the outcome of this argument is far from clear. Conversely, if the agreement were found to be covered by the

---

[18] The Carmack Amendment limits the liability of a carrier for lost or damaged goods to a value established by the carrier. <u>EVIC</u>, 2002 WL 1766554, at *9. For further discussion of the Carmack Amendment, see pp. 15-16 n.3, <u>supra</u>.

60

Tariff, UPS would still have to prove that there was adequate notice to prevail, another question that remains unanswered on the record. Thus, summary judgment must be denied.

### 4. Plaintiff's Fraudulent-Inducement Claim

To the extent that the insurance agreement was negotiated separately, plaintiff's fraud-in-the-inducement claim may remain viable. As suggested by Morales, if a claim for fraud is found to rest on matters that relate only tangentially to rates, routes and services, it can survive preemption. See Wellons v. Nw. Airlines, Inc., 165 F.3d 493, 494-96 (6th Cir. 1999) (finding that a fraud claim that bore "only the most tenuous relation to airline rates, routes, or services" was not preempted by the ADA). As stated above, where exactly courts are to draw the line in terms of what is tangentially related is unclear, but at the very least it cannot be said as a matter of law that this is a matter closely related to rates, routes and services, and therefore summary judgment on plaintiff's fraud-in-the-inducement claim, insofar as it concerns the insurance contract, is denied.

<u>Conclusion</u>

## Conclusion

For the foregoing reasons, the court grants summary judgment in favor of UPS on plaintiff's state-law fraud, misrepresentation, deceptive-business-practices, tortious-interference and breach-of-duty claims, as well as his fraudulent-inducement claim insofar as it relates to the contract for carriage. The court denies summary judgment on plaintiff's breach-of-contract and federal common-law negligence claims, as well as plaintiff's fraud-in-the-inducement claim as it relates to the insurance agreement.

**Dated: New York, New York**
**March 17, 2008**

SO ORDERED.

_____

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

62

Copies of the foregoing Memorandum and Order have been mailed today to:

Jonathan Roberts, Esq.
Mark R. Muccigrosso, Esq.
Talkin & Muccigrosso LLP
40 Exchange Place, Suite 1800
New York, NY 10005

Brianna Perry, Esq.
Adam Biegel, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

Karl Geercken, Esq.
Alston & Bird, LLP (NYC)
90 Park Avenue
New York, NY 10016